KING–SEELEY THERMOS CO.,
Plaintiff,

v.

ALADDIN INDUSTRIES, INCORPO-
RATED, Defendant.

Civ. No. 7320.

United States District Court
D. Connecticut.

Aug. 16, 1968.

John J. McGrath, J. Read Murphy, Murtha, Cullina, Richter & Pinney, Hartford, Conn., Nims, Martin, Halliday, Whitman & Bonynge, New York City, Arthur W. Dickey, Cyrus G. Minckler, Robert L. Boynton, Don K. Harness, Harness, Dickey & Pierce, Detroit, Mich., for plaintiff.

Curtiss K. Thompson, Thompson, Weir & Barclay, New Haven, Conn., Dugald S. McDougall, Theodore R. Scott, David L. Ladd, McDougall, Hersh, Scott & Ladd, Chicago, Ill., for defendant.

## MEMORANDUM OF DECISION ON MOTION TO MODIFY FINAL JUDGMENT AND INJUNCTION ENTERED DECEMBER 30, 1963

ANDERSON, Circuit Judge, sitting by designation.

This is a motion in the case of American Thermos Products Co. v. Aladdin Industries, Inc., 207 F.Supp. 9 (D.Conn. 1962) aff'd sub.nom., King-Seeley Thermos Co. v. Aladdin Industries, Inc., 321 F.2d 577 (2 Cir. 1963), by the defendant petitioning the court to modify ¶ 5 of its original order[1] to permit it to use the word "thermos", with an initial capital letter ("Thermos"), and with all capital letters ("THERMOS"), in its advertising and publicity releases, whenever the typography and/or capitalization of the word is consistent with that of other generic words used in connection with it, or is in accordance with ordinary rules of grammar, e. g., "Thermos" could be used at the beginning of a sentence, and provided that:

"(a) in each case such material is identified as emanating from defendant or its advertising or publicity representatives, and

(b) Defendant is prohibited from using the words 'genuine' or 'original' or any other words or phrases synonymous therewith relating to or referring to the word 'thermos'."

The defendant points out that these modifications would not affect the defendant's labeling of its products, which would remain subject to the terms of the original decree.

The defendant further asks the court to modify the order by the addition of a provision which would prohibit the plaintiff from using the word "genuine" with its trademarks except when used in combination with the word "brand"—i. e., "Genuine Thermos Brand"—with the words "genuine" and "brand" in the same size and type face.

In addition, the defendant asks the court to modify the injunction, dated December 30, 1963, in which the court ordered that all future references by the parties to the decisions concerning this litigation be in a specified form in order to prevent misrepresentations being made to members of the trade and the

1. The substance of the order is fully set forth in the Conclusions of Law, 207 F.Supp. 9, 14.

public as to the effect of these decisions, by adding to it the following:

"Plaintiff shall not have 'reasonable cause' to believe that its trademark rights have been violated by the use of the word *thermos* by persons other than defendant in any case where:

(a) such third parties use the word *thermos* in any form of capitalization or typography except the logotype "THERMOS"; and

(b) The typographical form and/or capitalization of the word *thermos* is consistent with that for other generic words used therewith."

The leading decisions on the power of a court of equity to modify a continuing decree or injunctive order are United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932) and United States v. United Shoe Machinery Corporation, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968).

In *Swift,* an anti-trust action, a consent decree was entered between the parties in 1920 by the terms of which a variety of restraints were imposed upon the defendant meat packers. In 1930 the packers moved for modification of the decree in the district court and a measure of relief was granted. On appeal by the United States, the Supreme Court reversed. After reviewing the evidence, the Court concluded that the danger of monopoly which led to the initial government complaint and to the decree had not been removed and that, although in some respects the decree had been effectuated there was still a danger of unlawful restraint of trade. Thus there was not a sufficient showing of "changed circumstances" to justify relaxation of the decree. In United States v. United Shoe Machinery Corp., supra, the Supreme Court described the holding of the *Swift* case in the following words:

"*Swift* teaches that a decree may be changed upon an appropriate showing, and it holds that it may *not* be

changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree (the elimination of monopoly and restrictive practices) have not been fully achieved." 88 S.Ct. at 1499.

*United Shoe* was the obverse of the situation in *Swift,* 88 S.Ct. at 1499, in that the motion for modification was brought by the plaintiff (the United States) seeking the imposition of additional restrictions on the defendant. In *United Shoe* the Court said that relief might be granted, despite the absence of changed circumstances, if, after "the running of a reasonable period during which the effects of the original decree have become clear," 88 S.Ct. at 1501, n. 5, it appeared that the original decree had not been wholly effective. The Court said:

"If the decree has not, after 10 years, achieved its 'principal objects,' namely, 'to extirpate practices that have caused or may hereafter cause monopolization, and to restore workable competition in the market'—the time has come to prescribe other, and if necessary more definitive, means to achieve the result."
88 S.Ct. at 1501.

The law of the *Swift* and *United Shoe* cases may be summed up as follows:

(1) Where a party seeks a modification which will relieve it of conditions or restrictions imposed by the original decree, it has the burden of showing that there has been such a change in circumstances that the danger at which the decree was directed no longer exists.

(2) Where one party seeks a modification which will impose new and additional restrictions upon the other, it must prove that the provisions of the original decree have failed fully to achieve the objects at which they were directed.

Applying these principles to the present case, the court finds that that

portion of Aladdin's motion which seeks to modify the injunctive order issued against King-Seeley on December 30, 1963, by adding thereto a new restriction on the practices of King-Seeley falls within the rule of the *United Shoe* case and that portion of the motion in which Aladdin asks the court to relieve it of certain restrictions imposed under ¶ 5 of the original order falls within the rule of the *Swift* case.

### A. *Modification of the 1963 Injunction*

The purpose of the 1963 injunction was to restrain King-Seeley from misrepresenting to the trade and to the public the effect of the decisions of this court and of the Court of Appeals. To this end, the court's order permitted King-Seeley "to send out policing letters to persons who, it has reasonable cause to believe, are violating its registered trademark rights," so long as those letters were in a form which the court prescribed.

On this motion, Aladdin does not claim that King-Seeley has failed to comply with the terms of the court's order, or that the form of policing letter used by King-Seeley subsequent to December 30, 1963 was in any way inconsistent with the order. Rather it claims that the court's decree itself has, over the intervening time, proved ineffective and that the injunction's controls on King-Seeley's policing actions have not eliminated the harassment by King-Seeley of Aladdin dealers to the degree that they were frightened away from using "thermos" in lower case, which the decision permitted them to do.

At the hearing on the motion, the defendant introduced into evidence advertisements which had appeared in newspapers and magazines subsequent to 1963 in regard to which King-Seeley had written policing letters claiming that the advertisements violated its trademark rights. Most of the violations consisted of uses of the words "Thermos" or "THERMOS" in connection with the advertisement of Aladdin products. Aladdin also introduced many letters which King-Seeley received in reply from the dealers who placed the advertisements, in addition to a few letters which Aladdin itself received from these dealers. The evidence shows generally that the infringements were unintentional, and that most dealers promised not to repeat the offending advertisements. In addition, it appears that some of the dealers were confused by the policing letters, and promised that they would no longer use any form of the word "thermos", but would always use the words "vacuum bottle" in connection with sales of Aladdin products.

The court finds that the defendant has not carried its burden of showing that the injunction dated December 30, 1963 has been ineffective. At most the evidence shows that some of the dealers who received policing letters were confused. But in large part this is due to the complexity of the subject matter of the litigation, the results of which are described in the letters, and in no part to any misrepresentations made by King-Seeley. In the few cases where confused dealers wrote to Aladdin for instructions as to what they should do in response to a policing letter, Aladdin failed to reply.

Aladdin emphasizes the fact that King-Seeley sends policing letters where the offending advertisements carry the name of a competitor in conjunction with the word "Thermos" or "THERMOS", but not, as a general rule, where "Thermos" or "THERMOS" appears without the competitor's name. Thus, Aladdin claims, letters are sent only where the source of the product is clearly identified in the advertisement, and where the possibility of confusion is at a minimum. Aladdin, however, has presented no evidence to show that consumer confusion is unlikely to result from advertisements in which Aladdin's name is employed in connection with "Thermos" or "THERMOS", valid trade-

marks of King-Seeley and recognized as such by at least a substantial segment of the consuming public. All King-Seeley's letters are written in regard to advertisements which clearly do infringe those trademarks under this court's *American Thermos* decision. Under these circumstances, the fact that King-Seeley may be motivated by its own best business interests in selecting the advertisements to which it will object, rather than by the degree of confusion it feels may result therefrom, is not relevant. Such a course of conduct does not amount to harassment of Aladdin dealers.

B. *Modification of ¶ 5 of the Decree*

The second part of the defendant's motion seeks a relaxation of the original decree so that Aladdin will be permitted to use the words "Thermos" and "THERMOS" in its advertising in addition to the lower case "thermos", in such a way that an advertisement need only be identified as emanating from Aladdin, rather than the stricter requirement of the current decree that each reference to "thermos" be preceded by the possessive of Aladdin.

Under the existing order Aladdin claims to suffer from the inability to reprint, in the form of an advertisement, a "testimonial letter" from a satisfied customer which contains the word "thermos" alone. It also asserts that newspaper editors tend to reject press releases where too frequent mention of the manufacturer is made, which is likely where "Aladdin's thermos" must invariably be used. Moreover, Aladdin represents it cannot use the popular "soft sell lead in" type advertisement, e. g., "who makes the best thermos?", but would have to say "who makes the best Aladdin's thermos?", which is not feasible for obvious reasons. The modification which Aladdin seeks would alleviate this, and would permit it to compete more effectively with King-Seeley.

While Aladdin has been somewhat limited in its use of certain forms of advertising, its advertising agent (Adler) testified that its advertisements had been effective under the decree, as is clear to the court from the exhibits before it. Aladdin is free to use the words bottle, vacuum bottle, etc., instead of "thermos" where the possessive of Aladdin is awkward.

■ But a showing of competitive disadvantage is not sufficient to support Aladdin's motion unless either (1) that disadvantage is so extreme as to amount to actual oppression, or (2) there is in addition proof of a change or changes in the factual setting which existed at the time of the entry of the decree which has resulted in the elimination of the dangers at which that decree was aimed. As the Supreme Court stated in United States v. Swift & Co., supra, 286 U.S. at 119, 52 S.Ct. at 464:

> "No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression."

■ The court concludes that there is an insufficient showing of hardship to justify modification of the decree.

In the light of the finding that a fairly substantial minority of the consuming public associated the term "thermos" with the trademarks and products of King-Seeley, the primary consideration which influenced this court to impose the restrictions on Aladdin, enumerated in ¶ 5 of the decree, was to eliminate the possibility of confusion and deception of this segment of the public. This court said:

> "However, on a balancing of the considerations of competitive disadvantage to the defendant against the risk that a minority of consumers who know, recognize and use 'thermos' as a trademark may be deceived, the latter must be given primary consideration and it is only in the event that the possibility of confusion engendering such deceit can be removed that con-

sideration can be given to the danger of plaintiff's monopoly as a reason for allowing the defendant and others to use 'thermos' generically."

207 F.Supp. at 27.

Aladdin has not shown that the danger at which ¶ 5 was directed has been eliminated through changing circumstances. There is no evidence to show that the substantial minority which the court sought to protect has diminished in size, or that the use of "thermos" generically for several years has removed the possibility that this group will continue to be confused. Without such evidence, however, the court has no guidance on the central question on this motion, i. e., "whether [the relief requested] can be made without prejudice to the interests of the class whom this particular restraint was intended to protect." 286 U.S. at 117–118, 52 S.Ct. at 463. As reiterated in *United Shoe*:

"*Swift* teaches that a decree * * * may not be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree * * * have not been fully achieved."

88 S.Ct. at 1499.

C. *"Genuine Thermos Brand"*

That portion of Aladdin's motion which seeks to impose upon King-Seeley the requirement that when it uses the word "genuine" with its trademarks it must also use the word "brand", to avoid the implication that competing vacuum containers are not genuine, is denied. There is in evidence no advertisement or release by King-Seeley from which such an inference can be drawn. In fact, in all five exhibits, offered on this claim, the word "brand" was used with the word "genuine", although sometimes in smaller size type; and the chances of any confusion were minimized by the fact that, in each, "genuine" was followed by thermos in the familiar logotype style, which is synonymous with "brand" in the minds of the public.

The motion is denied.